IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>vs.<br><br>DERRY JEREL HOWARD,<br><br>                    Defendant. | CR 23-86-BLG-SPW<br><br><br>ORDER |

Before the Court is Defendant Derry Jerel Howard's Motion to Suppress. (Doc. 19). Howard seeks to suppress all evidence obtained from law enforcement's seizure of him on January 11, 2023, on the grounds that the officers did not have reasonable suspicion of drug trafficking or two alleged traffic violations. (*Id.*). The United States opposes the motion, asserting that the drug investigation and traffic violations each justified the seizure. (Doc. 24).

Neither party requested a hearing. "An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000); *see also United States v. Cook*, 808 F.3d 1195, 1201 (9th Cir. 2015). The Court determined the briefing raised contested issues of fact, and a hearing was necessary.

The Court held a hearing on December 8, 2023. At the hearing, Billings Police Department Detective Steven Hallam and former Billings Police Department Officer Treyvor Malcolm testified. The Court finds the material facts are not disputed based on the parties' briefing, Officer Malcolm's and Detective Hallam's testimony, Officer Malcolm's dash camera footage (Doc. 25), and the police reports (Docs. 21, 24-1, 24-2, 24-3).

For the following reasons, the Court denies Howard's motion.

## I. Factual Background

Detective Hallam testified that, on January 11, 2023, an informant whose identity he knew and who had provided him reliable information multiple times in the past told him that Eric Tyler Shalosky was selling drugs in Billings. (*See also* Doc. 21 at 1). The informant told Detective Hallam that Shalosky planned to sell someone drugs in the Cabela's parking lot in south Billings. The informant learned this information from text messages from Shalosky that the informant saw on their roommate's phone.

Detective Hallam and other officers had had "numerous interactions" with Shalosky during which Shalosky was in possession of drugs and firearms. (*Id.* at 1, 5, 7, 11). In August 2022, officers arrested Shalosky for assault with a weapon in connection with a shooting at 1036 Avenue E in Billings. (Doc. 24-1 at 5). During an interview with officers, Shalosky admitted that drugs would likely be located at

2

the Avenue E residence. (*Id.*). Officers executed a search warrant on the residence and found 12.8 grams of methamphetamine and drug trafficking paraphernalia. (*Id.*). In September 2022, officers were executing a search warrant on a residence when they saw Shalosky and another man leaving the scene in a vehicle that contained narcotics and a firearm. (*See* Doc. 24-2). Then, in November 2022, Shalosky and his girlfriend, Raegan Moore, were found in a stolen vehicle and in possession of fentanyl and other narcotics. (*See* Doc. 24-3).

Law enforcement knew Shalosky was on GPS monitoring as a condition of his pretrial release in a state case. (Doc. 21 at 1). Officers contacted the GPS monitoring company for Shalosky's realtime location. (*Id.*). Using the location data from Shalosky's GPS, officers identified a black Jeep Liberty that appeared to be traveling in the same area and directions as Shalosky. (*Id.* at 9). Police began surveilling the Liberty, which Detective Hallam testified was "driving around the south side of town, really no rhyme or reason, [or] direction." Billings Police Department Sergeant Kramer observed the vehicle travel from an intersection near 2915 2nd Avenue S. to the Albertsons at 611 N. 27th Street, then return to the 2915 2nd Avenue S. residence, make multiple turns around the block, and return to the same residence. (*Id.* at 7). Sergeant Kramer explained in his report that drug traffickers often make such maneuvers, referred to as "heat runs," "to ensure they are not being followed by law enforcement." (*Id.*). Officer Malcolm reported that

when the Liberty parked in front 2915 2nd Avenue S., a black male, later identified as Howard, exited the driver's seat and entered the apartment building at that location. (*Id.* at 9). Howard returned to the vehicle shortly after and drove off. (*Id.*). Detective Hallam testified a stop this short can indicate drug trafficking.

Officer Malcolm followed the Liberty and reported that Howard "fail[ed] to signal two turns made at the intersection of Minnesota Ave and S 30th St as well as Minnesota Ave and S 29th St." (*Id.*). Officer Malcolm specified during the hearing that Howard failed to signal at the intersection of Minnesota Avenue and S. 30th Street and failed to appropriately signal—meaning at least 100 feet before turning— at Minnesota Avenue and S. 29th Street. (*See* Doc. 24 at 0:30–0:53). Officer Malcolm activated his lights and initiated the traffic stop. (*Id.* at 0:55–1:02). Howard continued northwest on S. 29th Street for one block, began turning on Montana Avenue, came almost to a stop in the middle of the turn, and pulled over only after Officer Malcolm drove up beside the Liberty and pointed the front end of his patrol car at an angle toward the Liberty. (*Id.* at 1:00–1:20).

Multiple other officers arrived at the scene. (*Id.* at 1:20). Howard opened the door and stepped out with his hands up. (*Id.* at 1:27). Detective Hallam saw a plastic bag containing a white crystal-like substance in plain view on the driver's seat, which, based on his training and experience, Detective Hallam believed to be methamphetamine. (Doc. 21 at 1). He also saw a circular container containing

4

numerous blue pills, which Detective Hallam believed to be fentanyl, in plain view through the back window of the Liberty. (*Id.*). Howard was detained, as were the other occupants of the vehicle (Shalosky, Moore, and Shari Burchell). (*Id.*).

Law enforcement obtained written consent from the occupants of the vehicle to search it as well as two purses and a backpack located inside. (*Id.*). Officers found fentanyl and methamphetamine. (*Id.*). All the occupants were given their *Miranda* rights. (*Id.* at 1–2). Howard told Detective Hallam he did not know the drugs were in the vehicle but "was unable" to explain "why he was sitting on the suspected meth" on the driver's seat. (*Id.* at 1). Shalosky told law enforcement that they were on their way to sell some fentanyl pills, and the drugs inside the vehicle were Howard's. (*Id.*). He said that Howard had a large amount of methamphetamine and thousands of fentanyl pills in Howard's apartment, which they had just left. (*Id.*). Burchell also stated to officers that the drugs found in the vehicle were Howard's and that Howard had a large amount of methamphetamine and pills in his apartment. (*Id.*). Moore said Burchell told her that Howard had a large amount of drugs in his apartment. (*Id.* at 1–2).

Detective Hallam re-approached Howard and confronted him about Shalosky's, Moore's, and Burchell's statements. (*Id.* at 2). Howard stated he was living at a motel with his wife, not near S. 29th Street and 2nd Avenue S. (*Id.*). He explained that he went into the apartment on 2nd Avenue S. to get money from a

friend to purchase drugs with, and that Shalosky was going to sell him the drugs found in the Liberty. (*Id.*).

Detective Hallam observed large amounts of cash in Howard's wallet, which Detective Hallam seized. (*Id.*). Officers arrested Shalosky and Howard for possession with intent to distribute. (*Id.*). Officers also located the apartment where Howard was staying—apartment 103 at 2915 2nd Avenue S.—and were granted a warrant to search it. (*Id.* at 3). Altogether, officers found 5.9 ounces of methamphetamine, 6.86 ounces of fentanyl, 1.7 grams of heroin, one gun, and $2,672 in cash in the Liberty, on Howard's person, and in the bedroom of the apartment. (*Id.* at 4). Howard was charged in this Court with Conspiracy to Possess with Intent to Distribute Controlled Substances in violation of 21 U.S.C. § 846, Possession with the Intent to Distribute Controlled Substances in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (Doc. 1).

## II.   Analysis

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Willis*, 431 F.3d 709, 714 (9th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "An officer may only conduct a brief, investigatory stop when the officer has a

reasonable, articulable suspicion that criminal activity is afoot." *United States v. Brown*, 925 F.3d 1150, 1153 (9th Cir. 2019) (internal citation and quotation marks omitted). "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002) (internal quotation marks omitted). "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000). The standard is "not a particularly high threshold to reach" but "a mere hunch is insufficient." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (internal citation and quotation marks omitted).

In determining whether reasonable suspicion exists, the underlying facts are considered in their totality and in light of the officer's experience. *Arvizu*, 534 U.S. at 273. The facts justifying a stop must be known to officers at the time of the stop. *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016).

If law enforcement violated Howard's Fourth Amendment right to be free from unreasonable searches and seizures, "then all evidence seized as a result of the unconstitutional actions of law enforcement must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).

Here, officers must have had reasonable suspicion either that the Liberty contained drugs at the time they pulled it over or that Howard committed at least one of the alleged traffic violations for the stop and subsequent seizure of the evidence. The Court will analyze each asserted basis in turn.

A.    *Drug Investigation*

The Government first argues the traffic stop on Howard was constitutional because law enforcement had reasonable suspicion of drug trafficking. (Doc. 24 at 7). The Government asserts that law enforcement's past interactions with Shalosky, informant's tip, and law enforcement's observations of the Liberty formed the basis of their reasonable suspicion. (*Id.* at 9). Howard contends that the information known to officers is so "limited" that it cannot provide reasonable suspicion. (Doc. 31 at 2).

Law enforcement may rely on an informant's information as a basis for establishing reasonable suspicion. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When considering whether an informant's tip is sufficient to support a finding of reasonable suspicion, the Court "must employ a 'totality-of-the-circumstances approach' that takes into consideration the informant's 'veracity' or 'reliability' and his 'basis of knowledge.'" *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006) (quoting *Gates*, 462 U.S. at 238). In the Ninth Circuit, courts consider four factors that bear on a tip's reliability and veracity: (1) whether the informant is

known, rather than anonymous; (2) whether the informant has a proven track record of reliability, as opposed to an unproven informant; (3) whether the informant reveals the basis for their knowledge; and (4) whether the tip provides "detailed predictive information about future events that is corroborated by police observation." *Id.* at 907–08.

The Government argues that the tip was "extremely reliable" based on the *Rowland* factors: The informant's identity was known to Detective Hallam, the informant had provided consistently reliable information to Detective Hallam on multiple occasions in the past, the informant told Detective Hallam that Shalosky was trying to offload drugs in Billings and planning to sell drugs at the Cabela's in Billings, and the informant told Detective Hallam that they learned such information when they saw text messages from Shalosky to the informant's roommate. (Doc. 24 at 8–9). Further, according to the Government, the additional facts known to officers—Shalosky's history of involvement with drugs and their physical observations of the Liberty's movements—corroborated the tip and provided officers reasonable suspicion to pull the Liberty over. (*Id.* at 9).

Howard maintains that none of the disclosed police reports discussed the reliability and veracity of the tip, and that developing such evidence through testimony would violate Howard's right to be informed of the nature of the evidence and to confront adverse witnesses under the Sixth Amendment. (Doc. 31 at 4).

9

Howard does not comment on the reliability and veracity of the tip in light of the Government's arguments. With respect to the additional facts cited by the Government, Howard notes that the interactions with law enforcement have not been adjudicated yet. (*Id.* at 2). Additionally, Howard suggests that the officers' use of Shalosky's GPS location data to investigate conduct separate from the conduct related to his pretrial release violated Shalosky's privacy rights. (*Id.* at 3).

The Court finds the tip did not provide law enforcement with reasonable suspicion that the occupants of the vehicle were engaged in drug trafficking at the time and/or the vehicle contained drugs because the tip supplied only vaguely predictive information about future events and was not corroborated by the officers' observations. Detective Hallam testified the informant is known to him, has provided him consistently reliable information on criminal activity in the past, revealed that Shalosky was trying to offload drugs in Billings and planned to sell drugs at Cabela's, and described that they had discovered such information from texts they had seen on their roommate's phone. However, the information concerning Shalosky's planned drug deal was not sufficiently detailed because it did not provide the day or time of the Cabela's drug transaction.

Further, the officers' observations did not corroborate the tip. The record demonstrates that the officers discovered the following after receiving the tip: First, Shalosky was riding in a 2005 black Jeep Liberty in the South Side of Billings.

10

Second, the Liberty was driving and making maneuvers indicative of drug trafficking. Third, the driver exited the Liberty, went into the apartment building while the other occupants remained in the vehicle, and returned to the Liberty minutes later—another indication of drug trafficking. Fourth, after the Liberty left the apartment, it traveled north toward downtown Billings.

The officers' observations did not corroborate that the vehicle contained drugs or was driving to Cabela's for the drug deal because Cabela's is south of the Liberty's location and the Liberty was driving north. The only arguably corroborative information was that the Liberty was driving and stopped at a residence in a way that, based on the officers training and experience, indicated drug trafficking. But both observations also describe "perfectly innocuous and legal behavior," and no other particularized observations warranted a conclusion that drugs were in the vehicle at that moment. *See United States v. Funk*, CR 22-121-BLG, 2023 WL 4268900, at *6 (D. Mont. June 29, 2023) (quoting *Montana v. Noli*, 529 P.3d 813, 840 (Mont. 2023)).

Given the tip did not provide specific predictive information about the supposed drug sale and the officers' observations served to disprove that the Liberty was on its way to the drug transaction or contained drugs, the drug investigation did

not provide officers with particularized reasonable suspicion to pull over Howard.[1]

## B.    Traffic Stop

Since the drug investigation did not provide officers the requisite reasonable suspicion, they must have had reasonable suspicion based on at least one of the alleged traffic violations for the seizure of Howard and the relevant evidence to be constitutional.  If particularized facts provide reasonable suspicion to justify a traffic stop, "the stop is lawful even if the officer made the stop only because he wished to investigate a more serious offense." *Magallon-Lopez*, 817 F.3d at 675 (citing *Whren v. United States*, 517 U.S. 806, 812–13 (1996)).  The analysis does not turn on "whether the officer is truthful about the reason for the stop." *Id.*

Howard urges the Court to depart from the standard articulated in *Magallon-Lopez* because of the "extreme manner" in which the Government is applying the laws in this case. (Doc. 31 at 9).  Howard specifically contends that the Government is "arguing fine points of law and changing the theory of the stop to justify this quick and violent intervention." (*Id.*).  He relies on the Montana Supreme Court's decision following *Whren* in *Montana v. Farabee*, 22 P.3d 175 (Mont. 2000), which held that courts should apply a heightened scrutiny if officers never actually had a reasonable suspicion of a traffic violation, or if law enforcement manufactured reasonable

---

[1] Because the Court finds the drug investigation did not provide officers with reasonable suspicion to pull Howard over, it will not address Howard's Sixth Amendment and privacy arguments.

suspicion (e.g. breaking someone's headlight). (*Id.*). Howard's argument fails for two reasons. First, Montana law is not controlling. Second, even if it was, Howard committed two turn signal violations, as explained below, so heightened scrutiny is not appropriate under *Farabee*. Further, even if the Court agrees with Howard that the basis for the second stop was changed from failure to signal to failure to appropriately signal, the first stop nonetheless provided law enforcement with reasonable suspicion to stop him.

Moving to the nature of the alleged traffic violations, both concern an alleged failure to properly signal at an intersection. Under Montana law, "[a] person may not turn a vehicle at an intersection ... or otherwise turn a vehicle from a direct course ... until an appropriate signal has been given." Mont. Code Ann. § 61-8-336(1). An "intersection" is defined under Montana law as:

> the area embraced within the prolongation or connection of the lateral curb lines or if there are no curb lines then the lateral boundary lines of the roadways of two highways that join one another at or approximately at right angles or the area within which vehicles traveling on different highways joining at any other angle may come in conflict.

*Id.* § 61-8-102(2)(k)(i).

### 1. *S. 30th Street and Minnesota Avenue*

The parties dispute whether Howard was required to signal when he turned from S. 30th Street onto Minnesota Avenue. In his opening brief, Howard argues he was not because S. 30th Street naturally "curves and becomes Minnesota Ave,"

as indicated by the yellow traffic sign at the intersection, and that "[a] motorist is not required to signal their preference between continuing down the road or leaving each time they pass a parking lot, alley or driveway." (Doc. 20 at 7 (citing Doc. 19-1)). Howard does not cite to any Montana traffic laws in making this argument.

The Government disagrees, arguing that the convergence is an intersection and that Howard was required to signal before turning at it because S. 30th Street and Minnesota "join each other at right angles." (Doc. 24 at 12 (citing Mont. Code Ann. § 61-8-102(2)(k)(i))). The Government also contends that Howard's argument is meritless because it relies on the yellow traffic sign rather than Montana law. (*Id.* at 11–12). Further, the sign does not impact the analysis, according to the Government, because the sign only indicates that vehicles should slow down to 15 mph before turning. (*Id.* at 12). "This makes sense as the intersection is uncontrolled and does not require a vehicle to stop[.]" (*Id.*).

On reply, Howard asserts that the convergence does not meet the definition of an intersection under Montana law because there is no chance of vehicles traveling on S. 30th Street and Minnesota Avenue, respectively, to come into conflict unless "one leaves their lane of travel causing the other to swerve or hitting it." (Doc. 31 at 6). With respect to the other scenarios in which a motorist must use their turn signal, Howard contends that he did not "otherwise turn from a direct course" because he followed the natural curve of S. 30th Street. (*Id.* at 5).

14

The Court agrees with the Government that Howard was required to signal before turning from South 30th Street onto Minnesota Avenue because their convergence is an intersection under Montana law. First, S. 30th Street and Minnesota Avenue join each other at right angles. The yellow traffic sign—which has an arrow at a right angle on it—confirms this, as does the photo taken of the intersection. (*See* Docs. 19-1, 24-4). Second, even if the streets do not converge at a right angle, a vehicle traveling on S. 30th Street could come into conflict with a person traveling southwest on Minnesota Street if the motorist on S. 30th Street continues northwest or turns into the private parking lot. (*See* Doc. 24-4). Thus, the convergence of S. 30th Street and Minnesota Avenue meets both definitions of an intersection in Montana Code Annotated § 61-8-102(2)(k)(i), and Howard was required to signal when he turned. His failure to signal constituted a violation of Montana law and gave Officer Malcolm reasonable suspicion to pull him over.

Even if Officer Malcolm was mistaken that Howard was not required to signal because the S. 30th Street and Minnesota Avenue is not an intersection and Howard did not otherwise turn his vehicle from a direct course, Officer Malcolm is entitled to reasonable mistakes of law in determining if reasonable suspicion exists to effectuate a *Terry* stop. *See Heien v. North Carolina*, 574 U.S. 54 (2014). Officer Malcolm's report describes the convergence of the streets as an intersection. (Doc. 21 at 9). He also testified that he believed Howard's actions constituted a violation

15

of the law and gave him reason to pull Howard over.  Officer Malcolm's conclusion is reasonable given the streets meet at a right angle.  Therefore, regardless of whether the convergence is actually an intersection under Montana law, Officer Malcolm had reasonable suspicion to pull Howard over based on Howard's failure to signal when he turned from S. 30th Street onto Minnesota Avenue.

      2.    *Minnesota Avenue and S. 29th Street*

The parties next dispute whether Howard properly signaled when he turned from Minnesota Avenue onto S. 29th Street.  Under Montana Code Annotated § 61-8-336(2), "[a] signal of intention to turn right or left, other than when passing, must be given continuously during not less than the last 100 feet traveled by the vehicle before turning in any business district, residence district, or urban district."  The parties do not dispute that Minnesota Avenue and N. 29th Street is an intersection.

Howard does not cite to this statute but argues that he "clearly signaled a left turn before turning left onto South 29th Street[.]" (Doc. 20 at 7).  The Government agrees and instead asserts Howard illegally failed to signal at least 100 feet before turning. (Doc. 24 at 11–12).  Howard does not address the Government's assertion that he failed to signal at least 100 feet before turning.  Rather, Howard contends that the 100-foot requirement does not apply here because the intersection was not in a business, residence, or urban district. (Doc. 31 at 6–8).

Since Howard does not dispute that he failed to signal at least 100 feet before turning, the only remaining question then is whether Howard turned within a business, residence, or urban district, such that the 100-foot requirement in Montana Code Annotated § 61-8-336(2) applied. The Court finds the intersection is within an urban district, so Howard was required to signal at least 100 feet before turning.[2]

An "urban district" is "the territory contiguous to and including any street that is built up with structures devoted to business, industry, or dwelling houses situated at intervals of less than 100 feet for a distance of one-fourth mile or more." *Id.* § 61-8-102(z). Howard contends that the area of S. 29th Street and Minnesota Avenue is not an urban district because there are no residences and all the buildings that could or have contained businesses are abandoned. (Doc. 31 at 7–8).

The intersection of S. 29th Street and Minnesota Avenue is in an urban district because the streets in every direction within a one fourth-mile radius of the intersection contain structures "devoted to business, industry, or dwelling houses" at 100-foot intervals. *Id.* § 61-8-102(z).[3] Within just two blocks—about one-eighth

---

[2] The Court acknowledges that Howard only raised this argument on reply, so the Government did not have an opportunity to respond to it. Normally, this would warrant the Court declining to address the argument. *See Zamari v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). However, it appears that the specific basis for alleging a traffic violation at South 30th Street was not clear to Howard until the Government's response, since none of the police reports state that his turn signal was inadequate, as opposed to absent. Thus, the Court will analyze the merits of the argument.

[3] The Court used Google Maps and its "Measuring Distance" feature to determine what buildings existed within a one-fourth mile of the intersection. The Court takes judicial notice of the location of the buildings, any of the businesses' Google My Business profiles, and their distance from the intersection and one another, for Google Maps is a source "whose accuracy cannot be reasonably

mile—southwest of the intersection are the Montana Rescue Mission's administration office (a tax-exempt care center for those experiencing hunger and homelessness), Kirks' Grocery (an art gallery), Gratitude in Action (a thrift store), the Montana Rail Link office (a railroad company), and various unoccupied buildings. The Montana Rail Link office occupies the entire northern half of the block, thus satisfying the 100-foot interval requirement.

To the northeast of the intersection are the Montana Rescue Mission Men's Shelter (a homeless shelter), KB Commercial Products (commercial products retailer), a parking lot, Big Sky Fencing Association (a fencing school), Yellowstone Aikikai (a martial arts studio), High Plains Architects (an architecture firm), and a couple of unoccupied buildings. Though the distance between the Men's Shelter and the next closest business—Big Sky Fencing Association—is more than 100 feet, the buildings in between formerly contained businesses. Additionally, northeast of Big Sky Fencing Association, the businesses are at 100-foot or less intervals.

To the southeast are the Billings Leadership Foundation (a nonprofit development company), Community Leadership & Development, Inc. (a nonprofit community development organization), two parking lots, Rail Line Coffee (a coffee

---

be questioned." *See United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012) (quoting Fed. R. Evid. 201(b)) (taking judicial notice of a Google map and satellite image as evidence of geographic facts). *See also Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1219 n.2 (10th Cir. 2007) (taking judicial notice of online distance calculations).

shop), Gerstner Adam Law (a law firm), some unoccupied buildings, and some residences. The businesses and residences are at less than 100-foot intervals on the entire southwest half of the intersection, and on the southern half of the northeastern half of the intersection.

Last, to the northwest are the Western Heritage Center (a museum), the Billings Army Navy Surplus Store, Black Salt Hair Co. (a hair salon), the Athenian (a Greek restaurant), the railroad tracks, and a pawn shop/art gallery. The buildings on the southern half of this quarter-mile stretch are not within 100 feet of each other due to the railroad tracks. However, on the northern half, they are within 100 feet of each other. Given the satisfaction of the 100-foot threshold in the other directions, the Court does not find that this feature disqualifies the area for urban district status.

The businesses are nonprofit and for-profit, some of which are open to the public and others of which are private. Beyond the eighth-mile threshold to the southeast are more houses and in the other directions are active businesses and unoccupied buildings. Given the presence of multiple business-occupied buildings and residences within a one-fourth mile radius of the intersection generally at intervals of 100 feet or less, the Court finds the intersection of Minnesota Avenue and S. 29th Street is in an urban district.

Howard contends that the area is not an urban district because the buildings contiguous to the relevant section of Minnesota Avenue are "abandoned and not

presently devoted to any purpose." (Doc. 31 at 8). This argument fails for two reasons. First, Howard selectively looks only at the southwest-northeast cross-section of Minnesota Avenue and S. 29th Street; he ignores the northwest-southeast cross-section, which contains active businesses, residences, and unoccupied buildings. Second, nothing in the statute says the buildings need to be *presently* devoted to a business, industry, or residential purpose. In fact, a comparison of the definition of an urban district with that of a business district, which plainly requires active use, highlights that § 61-8-102(z) does not require present use for an urban district. *Cf.* Mont. Code Ann. § 61-8-102(d) ("'Business district' means the territory contiguous to and including a highway when within any 600 feet along a highway there are buildings *in use* for business or industrial purposes ....") (emphasis added). The statute seems to indicate that only the intended purpose of the building be for business, industry, or dwellings.

Howard also argues without explanation that the Montana Rescue Mission "does not fit a common understanding of" the term "business or industrial purpose[]" in the statute. (Doc. 31 at 7). The Court disagrees. The Montana Rescue Mission Men's Shelter, though a tax-exempt organization, receives and spends money and is open to the public to serve the public need.[4] Further, even if the Montana Rescue Mission is not a business, the Court's conclusion that the area is an urban district

---

[4] *See Our Mission*, Montana Rescue Mission, https://perma.cc/933X-DVPB.

does not change given the presence multiple other businesses and dwellings within a one-fourth mile radius in every direction.

It is worth noting that if Howard is correct that the intersection is not a business, residence, or urban district, he was required to signal 200 feet *earlier* than if he was in such a district. Montana Code Annotated § 61-8-336(3) requires vehicles turning in areas not designated as business, residence, or urban districts to signal at least 300 feet before turning. So, regardless of whether Howard was in an business, residence, or urban district, his choice to signal less than 100 feet before turning constituted a violation of Montana law and provided reasonable suspicion for Officer Malcolm to seize him.

## III.   Conclusion

Because Officer Malcolm had reasonable suspicion that Howard violated two traffic laws, his seizure of Howard and the subsequent seizure of the challenged evidence was constitutional. Howard's Fourth Amendment rights were not violated, and suppression is not warranted. IT IS HEREBY ORDERED that Defendant Derry Jerel Howard's Motion to Suppress (Doc. 19) is DENIED.

DATED this __5th__ day of January, 2024.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge