IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>vs.<br><br>DERRY JEREL HOWARD,<br><br>                    Defendant. | CR 23-86-BLG-SPW<br><br><br>ORDER |

Before the Court are two motions to suppress filed by Defendant Derry Jerel Howard. (Docs. 50, 51).[1] These are the second and third suppression motions filed in this case. In Howard's first motion, Howard sought suppression of all evidence obtained from law enforcement's seizure of him on January 11, 2023, on the grounds that the officers did not have reasonable suspicion of drug trafficking or two alleged traffic violations. (Doc. 19). After the motion was fully briefed, the Court held an evidentiary hearing during which Billings Police Department Detective Steven Hallam and former Billings Police Department Officer Treyvor Malcolm testified. (Doc. 38).

Based on the parties' briefing, Officer Malcolm's and Detective Hallam's

---

[1] The Court advises Howard that the Local Rules require him to file his briefs in support of his motions separately from the motion, rather than as an exhibit, as he did here. D. Mont. L.R. 7.1(d)(1)(A).

testimony, Officer Malcolm's dash camera footage (Doc. 25), and the police reports (Docs. 21, 24-1, 24-2, 24-3), the Court denied the motion. (Doc. 39). The Court held that though the officers did not have reasonable suspicion to pull Howard over based on drug trafficking, they had reasonable suspicion to pull him over based on two alleged traffic violations. (Doc. 39 at 8–21). The traffic violations gave the officers grounds to arrest Howard and justified the seizure of evidence flowing from Howard's arrest. (*Id.* at 13–21).

Howard's current motions seek suppression on two grounds. Howard's first motion seeks suppression of all physical evidence obtained in the search of Howard's residence and cell phone and of his statements made during and after the search.[2] (Doc. 50 at 1, Doc. 50-1 at 1). Howard argues that the affidavit attached to the search warrant application for Howard's residence omitted information, which "directly undermines" the district court's probable cause determination. (*Id.* at 9–19). Howard requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 171 (1978) to determine if the statements in the affidavit intentionally or recklessly misled the district court. (*Id.* at 5–6).

Howard's second motion asks the Court to suppress all evidence obtained through the GPS monitor affixed to Howard's passenger, Eric Tyler Shalosky, who

---

[2] The record does not indicate that law enforcement searched Howard's cell phone or that Howard made certain statements during the search, since he was not present during the search.

was on pretrial release. (Doc. 51-1). Howard argues law enforcement did not have particularized suspicion to obtain Shalosky's realtime GPS data, which constitutes a search of Shalosky and by extension Howard, without a warrant. (*Id.* at 6–17).

The Government responded to both motions. (Docs. 53, 55). Howard replied only to the motion challenging law enforcement's use of Shalosky's GPS data.

For the following reasons, the Court denies both of Howard's motions.

## I.    Factual Background

The Court detailed the facts of this case extensively in its order on Howard's first motion to suppress. (Doc. 39). For convenience, the Court will include them here, with some additional facts that are necessary to consider given the types of challenges Howard asserts.

Detective Hallam testified that, on January 11, 2023, an informant whose identity he knew and who had provided him reliable information multiple times in the past told him that Shalosky was selling drugs in Billings. (*See also* Doc. 21 at 1). The informant told Detective Hallam that Shalosky planned to sell someone drugs in the Cabela's parking lot in south Billings. The informant learned this information from text messages from Shalosky that the informant saw on their roommate's phone.

Detective Hallam and other officers had had "numerous interactions" with Shalosky during which Shalosky was in possession of drugs and firearms. (*Id.* at 1,

5, 7, 11). In August 2022, officers arrested Shalosky for assault with a weapon in connection with a shooting at 1036 Avenue E in Billings. (Doc. 24-1 at 5). During an interview with officers, Shalosky admitted that drugs would likely be located at the Avenue E residence. (*Id.*). Officers executed a search warrant on the residence and found 12.8 grams of methamphetamine and drug trafficking paraphernalia. (*Id.*). In September 2022, officers were executing a search warrant on a residence when they saw Shalosky and another man leaving the scene in a vehicle that contained narcotics and a firearm. (*See* Doc. 24-2). Then, in November 2022, Shalosky and his girlfriend, Raegan Moore, were found in a stolen vehicle and in possession of fentanyl and other narcotics. (*See* Doc. 24-3).

Law enforcement knew Shalosky was on GPS monitoring as a condition of his pretrial release in a state case. (Doc. 21 at 1; Doc. 51-2 at 1). The officers contacted the GPS monitoring company for Shalosky's realtime location. (Doc. 21 at 1). Using the location data from Shalosky's GPS, the officers identified a black Jeep Liberty that appeared to be traveling in the same area and directions as Shalosky. (*Id.* at 9). Police began surveilling the Liberty, which Detective Hallam testified was "driving around the south side of town, really no rhyme or reason, [or] direction." Billings Police Department Sergeant Kramer observed the vehicle travel from an intersection near 2915 2nd Avenue S. to the Albertsons at 611 N. 27th Street, then return to the 2915 2nd Avenue S. residence, make multiple turns around the

4

block, and return to the same residence. (*Id.* at 7). Sergeant Kramer explained in his report that drug traffickers often make such maneuvers, referred to as "heat runs," "to ensure they are not being followed by law enforcement." (*Id.*). Officer Malcolm reported that when the Liberty parked in front of 2915 2nd Avenue S., a black male, later identified as Howard, exited the driver's seat and entered the apartment building at that location. (*Id.* at 9). Howard returned to the vehicle shortly after and drove off. (*Id.*). Detective Hallam testified that a stop this short can indicate drug trafficking.

Officer Malcolm followed the Liberty and reported that Howard "fail[ed] to signal two turns made at the intersection of Minnesota Ave and S 30th St as well as Minnesota Ave and S 29th St." (*Id.*). Officer Malcolm specified during the hearing that Howard failed to signal at the intersection of Minnesota Avenue and S. 30th Street and failed to appropriately signal—meaning at least 100 feet before turning—at Minnesota Avenue and S. 29th Street. (*See* Doc. 24 at 0:30–0:53). Officer Malcolm activated his lights and initiated the traffic stop. (*Id.* at 0:55–1:02). Howard continued northwest on S. 29th Street for one block, began turning on Montana Avenue, came almost to a stop in the middle of the turn, and pulled over only after Officer Malcolm drove up beside the Liberty and pointed the front end of his patrol car at an angle toward the Liberty. (*Id.* at 1:00–1:20).

Multiple other officers arrived at the scene. (*Id.* at 1:20). Howard opened the

door and stepped out with his hands up. (*Id.* at 1:27). Detective Hallam saw a plastic bag containing a white crystal-like substance in plain view on the driver's seat, which, based on his training and experience, Detective Hallam believed to be methamphetamine. (Doc. 21 at 1). He also saw a circular container containing numerous blue pills, which Detective Hallam believed to be fentanyl, in plain view through the back window of the Liberty. (*Id.*). Howard was detained, as were the other occupants of the vehicle (Shalosky, Moore, and Shari Burchell). (*Id.*).

Law enforcement obtained written consent from the occupants of the vehicle to search the vehicle as well as two purses and a backpack located inside. (*Id.*). The officers found fentanyl and methamphetamine. (*Id.*). All the occupants were read their *Miranda* rights. (*Id.* at 1–2). Howard told Detective Hallam he did not know the drugs were in the vehicle but "was unable" to explain "why he was sitting on the suspected meth" on the driver's seat. (*Id.* at 1). Shalosky told law enforcement that they were on their way to sell some fentanyl pills, and the drugs inside the vehicle were Howard's. (*Id.*). He said that Howard had a large amount of methamphetamine and thousands of fentanyl pills in Howard's apartment, which they had just left. (*Id.*). Burchell also stated to officers that the drugs found in the vehicle were Howard's and that Howard had a large amount of methamphetamine and pills in his apartment. (*Id.*). Moore said Burchell told her that Howard had a large amount of drugs in his apartment. (*Id.* at 1–2).

Detective Hallam re-approached Howard and confronted him about Shalosky's, Moore's, and Burchell's statements. (*Id.* at 2). Howard stated he was living at a motel with his wife, not near S. 29th Street and 2nd Avenue S. (*Id.*). He explained that he went into the apartment on 2nd Avenue S. to get money from a friend to purchase drugs with, and that Shalosky was going to sell him the drugs found in the Liberty. (*Id.*).

Detective Hallam observed large amounts of cash in Howard's wallet, which Detective Hallam seized. (*Id.*). The officers arrested Shalosky and Howard for possession with intent to distribute. (*Id.*).

After he was arrested, Shalosky agreed to show law enforcement the general area where he believed Howard's apartment was. (Doc. 21 at 5). Officer Hilde and Task Force Officer ("TFO") Stroble drove Shalosky to the 2900 block of 2nd Avenue S., "where he advised he was not sure what unit it was but pointed out the complex." (*Id.*). Shalosky was then transported to the Yellowstone County Detention Facility. (*Id.*).

Officer Hilde and TFO Stroble approached the complex and made contact with a "bystander." (*Id.*). The "bystander was able to point out what unit Howard was staying in after we provided a detailed description of his physical descriptors," according to Officer Hilde's report. (*Id.*). The officers went to the unit—unit 103— and knocked on the door. (*Id.*). A woman named Melanie Golden responded. (*Id.*).

Officer Hilde asked who her husband was, and she said Howard. (*Id.*). Officer Hilde secured the apartment pending a search warrant. (*Id.*).

Once the warrant was granted, law enforcement searched the apartment and found 9mm ammunition, a black cell phone box containing a large amount of M-30 fentanyl pills and what appeared to be methamphetamine on the nightstand, a small vial containing multiple fentanyl pills under the bed, and another firearm under one of the pillows on the bed. (*Id.*). Altogether, officers found 5.9 ounces of methamphetamine, 6.86 ounces of fentanyl, 1.7 grams of heroin, one gun, and $2,672 in cash in the Liberty, on Howard's person, and in the bedroom of the apartment. (*Id.* at 4).

Later that day, Officer Tomero and Detective Hallam interviewed Howard at the jail. (*Id.* at 3). He was Mirandized and agreed to speak with them. Detective Hallam wrote in his report that Howard was "a compulsive liar" during the interview, as he "was unable to remember what story he had initially told me" and "kept changing the narrative every time I asked him to tell me the story again." (*Id.*). Detective Hallam noted that Howard admitted to the following facts: (1) that Shaloksy had set up a drug deal and he was a willing participant prior to the traffic stop; (2) that he had recently purchased $4,900 to $5,100 worth of methamphetamine and fentanyl pills and planned to sell the pills; (3) that he knew what was inside the black cell phone box and had placed it in his room; and (4) that his fingerprints would

be on the pistol found at the apartment. (*Id.*). Off the record, Howard told Detective Hallam he had purchased the drugs "to try and make a quick buck.". (*Id.*).

Howard was charged in this Court with Conspiracy to Possess with Intent to Distribute Controlled Substances in violation of 21 U.S.C. § 846, Possession with the Intent to Distribute Controlled Substances in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (Doc. 1).

## II. Analysis

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches conducted without a warrant are per se unreasonable under the Fourth Amendment, except in a "few specifically established and well delineated" situations. *Katz v. United States*, 389 U.S. 347, 357 (1967); *see also Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) ("A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement[.]").

Howard challenges two searches, one with a warrant (the residence) and one without a warrant (the GPS data). The Court will address each in turn.

### A.   *Search of the Residence and* Franks *Hearing*

The Fourth Amendment provides that "no Warrants shall issue, but upon

probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. When assessing validity of the warrant, the reviewing court is limited to considering only the information presented to the magistrate judge. *Aguilar v. Texas*, 378 U.S. 108, 109 n.1 (1964), *abrogated on other grounds by Illinois v. Gates*, 462 U.S. 213 (1983).

Criminal defendants have a limited right pursuant to the Fourth and Fourteenth Amendments to challenge the truthfulness of factual statements made in an affidavit supporting a search warrant. *See Herring v. United States*, 555 U.S. 135, 145 (2009). Under *Franks v. Delaware*, a criminal defendant is entitled to a hearing when he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and the allegedly false statement is "necessary to the finding of probable cause." 438 U.S. at 155–56.

The Ninth Circuit has further clarified when the Court should grant a request for a *Franks* hearing:

> (1) the defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations; (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause.

*United States v. DiCesare*, 765 F.2d 890, 894–95 (9th Cir. 1985) (citing *United*

*States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983)).

The limited right of criminal defendants to challenge false statements in a warrant affidavit under *Franks* also allows criminal defendants to "challenge a warrant affidavit valid on its face when it contains deliberate or reckless omissions of facts that tend to mislead." *United States v. Stanert*, 762 F.2d 775, 780–81 (9th Cir. 1985). To warrant a *Franks* hearing for an alleged material omission, the defendant must first make a "substantial preliminary showing that the affidavit contained a misleading omission and that the omission resulted from a deliberate or reckless disregard for the truth" and, second, must demonstrate "that had there been no omission, the affidavit would have been insufficient to establish probable cause." *United States v. Kyllo*, 37 F.3d 526, 529 (9th Cir. 1994). Omissions are material only when the omitted facts "cast doubt on the existence of probable cause." *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992).

A defendant does not need to show clear proof of deliberate or reckless omissions. *United States v. Chesher*, 678 F.2d 1353, 1362 (9th Cir. 1982). However, the offer of proof showing intentionality or recklessness must be "substantial." *Franks*, 438 U.S. 155–56. "Allegations of negligence or innocent mistake are insufficient" to qualify for an evidentiary hearing. *Id.* at 171. Furthermore, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit

11

to support a finding of probable cause, no hearing is required." *Id.* at 171–72.

Underlying the Court's analysis is the well-settled rule that "[i]n doubtful cases, preference should be given to the validity of the warrant." *United States Burnes*, 816 F.2d 1354, 1357 (9th Cir. 1987) (quoting *United States v. McQuisten*, 795 F.2d 858, 861 (9th Cir. 1986)) (alteration in original). This deference extends to the affidavit underlying the warrant, for the "inquiry [of whether a defendant has made a substantial preliminary showing of deliberate or reckless falsity] begins with a presumption that an affidavit in support of a search warrant is valid." *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004) (citing *Franks*, 438 U.S. at 171).

Howard alleges the affidavit contained false information and omitted certain facts.[3] (Doc. 50-1 at 11). Thus, Howard must show that the affidavit, scrubbed of the false statements and supplemented by the alleged omissions, would be insufficient to support a finding of probable cause. *See Stanert*, 762 F.2d at 782. Probable cause exists if the affidavit provides a substantial basis for believing that criminal activity might have been occurring at the place to be searched. *See United States v. Martinez-Garcia*, 397 F.3d 1205, 1216 (9th Cir. 2005). "Probable cause requires a fair probability, but not a certainty, that a search would yield evidence of

---

[3] Howard argues that the search warrant application contained false information. (*See* Doc. 50-1 at 11). However, he never identifies any false statements, and his reasoning focuses on omitted and misleading statements. Since Howard generally characterizes the warrant as omitting some facts and presenting others in a misleading manner, (doc. 50-1 at 7), the Court will not assess whether the warrant contained false information.

crime." *Id.* at 1217 (citing *Illinois v. Gates*, 462 U.S. 213, 231–32 (1983)).

### 1.    *Location of the Additional Drugs and Apartment Unit*

Howard first argues that the information in the search warrant fails to provide a "[s]ufficient [n]exus" between the additional drugs the passengers stated Howard supposedly had access to and the apartment officers eventually searched. (Doc. 50-1 at 8–9). The only information in the warrant is that Shalosky stated that they had stopped at Howard's apartment to retrieve fentanyl to sell and Howard said he had a large amount of drugs to sell, and that Burchell confirmed this statement. (*Id.* at 9). Thus, according to Howard, the warrant fails to establish probable cause that illegal drugs would be found at the apartment. (*Id.* at 9–10).

The Government generally responds that Howard has failed to establish the elements required for a *Franks* hearing, specifically that any portion of the warrant was false, that the false statements were deliberately or recklessly made, and that the supposedly false statements were necessary to establish probable cause. (Doc. 55 at 13). The Government then describes how the affidavit established probable cause that additional drugs were located in Howard's apartment: First, it detailed how Howard was found in a car with a known drug dealer (Shalosky), drugs, a digital scale, and $750 in cash. (*Id.* at 11). Second, the affidavit explained how Shalosky told officers after being Mirandized that they had stopped at Howard's apartment to retrieve fentanyl to sell and that Howard had told him he had a large amount of drugs

13

to sell. (*Id.* at 12). Last, the affidavit stated that the officers "were able to locate" Howard's apartment, inside of which was Howard's wife. (*Id.*). The officers' reports confirm the details contained in the affidavit, and any details contained in the report that are not in the affidavit only serve to bolster the affidavit, not undermine it. (*Id.* at 11–13). Thus, according to the Government, the affidavit established a sufficient nexus between Howard's apartment and the additional drugs. (*Id.*).

The Court finds Howard has failed to make any showing that a *Franks* hearing is warranted based on the nexus between Howard's residence and the additional drugs. As an initial matter, Howard does not point to any false or omitted statements in the affidavit, as required to warrant a *Franks* hearing. Instead, he effectively argues the district judge erroneously concluded that the warrant contained sufficient information to establish probable cause. Second, even assuming Howard made a substantial showing that the affidavit contained false or omitted statements, he did not even attempt to argue, let alone provide an offer of proof, that the affiant deliberately or recklessly included false statements or omitted true ones.

In fact, if the omitted facts were added to the affidavit, they would have established a stronger connection between the additional drugs and the apartment. Those facts include that, when Burshell confirmed with Detective Hallam Shalosky's statement that Howard had "a large amount of meth and pills in his apartment," she also specified that his apartment was located around South 29th St.

14

and 2nd Avenue S.. (Doc. 55-1 at 1). Howard also admitted going into the apartment earlier to get money to buy drugs from Shalosky. (*Id.* at 2). Though Howard denied residing at the apartment and did not state that drugs were inside the apartment (*id.*), Howard's admission that he had entered the apartment for a purpose related to a drug deal, combined with the accounts of the other passengers that Howard had more drugs, further bolster a finding of probable cause.

Accordingly, the Court denies this part of the motion.

## 2. *Location of Apartment Unit*

Howard also argues that the warrant fails to articulate how the officers figured out which apartment unit Howard was staying in. (*Id.* at 11). According to Howard, the warrant's statement that the passengers reported to police that they had stopped at Howard's apartment to retrieve drugs is misleading because it implies that the passengers went into the unit with Howard when they only stopped in front of the apartment complex. (*Id.*). The warrant also misleadingly fails to state that there were multiple units in the complex and that the passengers could not see which unit he went into. (*Id.*). As to the statements in the warrant that officers "were able to locate Derry's apartment at 2915 2nd Ave S. #103" and that officers found Howard's wife inside that unit, Howard argues the officers omitted from the warrant that they did not check if any of the other units were rented or used by Howard. (*Id.* at 11–12). Howard asserts that the omitted facts undermine the probable cause

determination and justify a *Franks* hearing.

In response, the Government first asserts that Howard failed to meet his burden to justify a *Franks* hearing. It next argues the affidavit is sufficient. (*Id.* at 14). The affidavit describes how officers saw Howard enter the apartment complex, and how Shalosky confirmed that this was the same complex where Howard lived. (*Id.*). The Government then recounts how a bystander told officers Howard lived in Unit 103, inside of which officers found a woman who said she was Howard's wife. (*Id.*). The information about the bystander is not in the affidavit.

The Court again holds that Howard has failed to meet his burden to show the necessity of a *Franks* hearing. As an initial matter, the Court agrees with Howard that the affidavit's characterization of Shalosky's statement about them "stop[ping] at [Howard's] apartment to retrieve fentanyl to sell" could be read as implying that they went into the apartment, not that they drove up to it and stayed in the car while Howard went in. (Doc. 50-1 at 22). However, Howard again does not attempt to argue, let alone provide an offer of proof, that the affiant intentionally or recklessly included the misleading statement and omitted additional facts.

Further, the addition of the omitted facts does not undermine, but rather bolsters, the finding of probable cause. The affidavit omits that after the traffic stop, two officers transported Shalosky to the 2900 block of 2nd Avenue S., where Shalosky pointed out the apartment complex where Howard lived. (Doc. 55-2 at 1).

He could not pick out the unit, so the two officers went to the complex and spoke with a bystander, who "was able to point out what unit Howard was staying in after we provided a detailed description of his physical descriptors." (*Id.*). The bystander advised Howard was staying in unit 103. (*Id.*). The officers knocked on the door, and a woman identified as Melanie Golden responded. (*Id.* at 1–2). Officer Hilde asked her who her husband was, and she said Howard. (*Id.*).

Thus, in all, the officers knew that Howard had been inside a unit in the apartment complex at 2915 2nd Ave S. based on their personal observations and Howard's admission. They initially suspected Howard resided there based on two witness accounts. They then confirmed their suspicions that he resided in the complex and specifically unit 103 based on the account of a bystander and their contact with his wife. In total, these facts are sufficient to establish probable cause. The officers did not need to check if Howard used or rented other units in the complex, since they developed particularized probable cause with respect to unit 103.

Accordingly, a *Franks* hearing is not warranted because Howard failed to allege that the affiant omitted certain information with the requisite mental state and because the addition of the omitted facts does not undermine the probable cause determination. The Court denies this portion of the motion.

### 3.   *Reliability of the "Informants"*

With respect to the search warrant, Howard last challenges the affidavit as failing to provide sufficient information about the reliability of the information given to the officers by the passengers—Shalosky, Bushnell, and Moore—who Howard describes as "informants." (Doc. 50-1 at 13). Howard analogizes to *United States v. Bell*, 585 F.3d 1045 (7th Cir. 2009), which found that the affidavit for the warrant to search Bell's house failed to provide the court with sufficient information regarding the reliability of the information. *Bell* reasoned that the affidavit did not indicate whether the informant had provided information to law enforcement in the past, including any information about the nature of the informant's relationship with Bell or how the informant came by his knowledge, or detail if the officers corroborated the informant's tip. (*Id.* at 15–17 (discussing *Bell*, 585 F.3d at 1050). Howard avers the affidavit here lacks the same information.

The Government responds that the passengers are not "informants" as caselaw generally defines them. (Doc. 55 at 14). According to the Government, informants are "individuals who approach law enforcement (usually to derive some benefit) and inform them of criminal information they are aware of." (*Id.* at 15). They are "a separate class from normal witnesses because their credibility is more questionable, and the law enforcement officers who rely on their statements are less able to verify the truth of what an informant says." (*Id.*). Shalosky and Bushnell are normal

witnesses, as "they were in the car with Howard and participating in his criminal activities" when they encountered police. (*Id.*). The Government also notes that Howard applies a test for the reliability of informants from the Seventh Circuit, which is different from that in the Ninth Circuit. (*Id.* at 14).

As an initial matter, a *Franks* hearing is not warranted because Howard failed to argue or offer any evidence that the affiant omitted any information with the requisite mental state. Additionally, the Court agrees with the Government that the passengers are not informants whose reliability must be a central focus of the Court's inquiry. As the Government explained, an informant is someone who reaches out to or works with law enforcement to give law enforcement information about crimes. *See, e.g.,* Billings Police Department, Policy & Procedure Manual 7-2 (2022), https://perma.cc/M8CB-AP8C (Billings Police Department's policy on use of informants). They generally have a relationship with law enforcement prior to giving the tip, which justifies the factor in the Ninth Circuit for the reliability of an informant that asks whether the informant has a track record of reliability. *See id.*; *United States v. Rowland*, 464 F.3d 899, 908 (9th Cir. 2006) (setting forth the test for reliability of an informant).[4]

---

[4] The Court also agrees with the Government that Howard incorrectly cites the Seventh Circuit's test for the reliability of an informant, which is different than the test in the Ninth Circuit. The Ninth Circuit test, articulated in *Rowland*, considers (1) if the informant is known or anonymous, (2) if the informant has a proven track record of reliability, (3) if the informant reveals how they came to know the information, and (4) if the tip provides predictive information about future events that is corroborated by police observation. 464 F.3d at 908. The test articulated in the Seventh

Instead, the passengers were merely subjects of police questioning who provided information based on their first-hand knowledge. *See* 2 Wayne R. LaFave, *Search and Seizure: A Treatise On The Fourth Amendment* § 3.6(f) (6th ed. 2024) (describing how responses to informal questions from police and to formal interrogative questioning about someone's first-hand knowledge of criminal activity can be used to establish probable cause). They did not approach the officers with information about Howard. Rather, they encountered the police because they were in a car subject to a traffic stop and talked with them because law enforcement asked them certain questions about their knowledge of Howard's drug dealing. The nature of the relationship to police is clear from the affidavit and thus the affidavit cannot arguably be challenged as including false or misleading information.

Even if the passengers were considered informants and the Court needed to apply the reliability test outlined in *Rowland*, the passengers would be considered reliable. As to the first factor—whether the informant's identity is known or they are anonymous—the passengers are identified in the affidavit, since they each

---

Circuit's decision in *Bell* lists the relevant factors as: (1) the extent to which police corroborated the informant's statements; (2) the degree to which the informant acquired knowledge of the events through first-hand observation; (3) the amount of detail provided; and (4) the interval between the date of the events and the police officer's application for the search warrant. 585 F.3d at 1049.

Howard is advised that in future motions he must cite the controlling caselaw in the Ninth Circuit, if it exists, and, in the alternative, persuasive district court caselaw from the Ninth Circuit before relying on out-of-circuit caselaw. The *Rowland* test is easily discoverable in a search of any legal database, which makes Howard's failure to cite to or rely on it particularly troubling.

provided their name to the officers. Additionally, the affidavit explains that officers were familiar with Shalosky from past criminal investigations. As to the second factor—if the informant has a proven track record of reliability—the record does not indicate that any of them had served as informants previously. As to the third factor—how they came to know the information—the affidavit describes that Shalosky knew Howard had a large quantity of drugs because Howard told him and knew where Howard lived because they had stopped there previously. As to the fourth and most important factor to this analysis—whether the police corroborated the information—the affidavit describes how the officers saw in plain view and found upon searching drugs in the car and that officers confirmed the location of Howard's apartment by knocking on the door and speaking with a woman, who confirmed she was Howard's wife. The other information from the officers' reports, described above, further corroborated the passengers' information. Together, the totality of the information obtained by law enforcement established the probable cause necessary for a search warrant.

Accordingly, a *Franks* hearing is not warranted on this ground.

B.     *Warrantless Search of GPS Data*

Howard's second motion seeks suppression of all the evidence obtained as a result of law enforcement's use of Shalosky's GPS data. (Doc. 51-1 at 1). Howard contends law enforcement illegally accessed Shalosky's GPS data without a warrant

or reasonable suspicion. (Doc. 51-1 at 6). Howard requested a hearing on the matter. (Doc. 51-1 at 7). The Government responds that Howard's motion should be denied because he does not have standing under the Fourth Amendment to challenge an alleged violation of another person's reasonable expectation of privacy. (Doc. 53 at 1). Howard filed a reply. (Doc. 61).

The Court denies Howard's request for a hearing. "An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). Howard's motion does not raise any material factual disputes. Rather, his motion can be resolved squarely on legal grounds. Additionally, the Court held a hearing for Howard's first motion to suppress, so the record is well developed.

For the following reasons, the Court denies the motion.

### 1.    Fourth Amendment

The parties first disagree on whether Howard has standing to challenge law enforcement's use of the data from Shalosky's GPS device. Howard contends that he had a reasonable expectation of privacy in his location and where he was traveling. (Doc. 61 at 3). Thus, law enforcement's illegal use of Shalosky's GPS data, "especially after knowing that Shalosky was not the driver, but was instead using the GPS data to track a large Black Male (of which Shalosky is not) directly

22

infringed upon [Howard's] own reasonable expectation of privacy." (*Id*. at 5).

The Government maintains that Howard lacks standing to challenge the use and monitoring of Shalosky's GPS data on Fourth Amendment grounds because Howard does not have a reasonable expectation of privacy over Shalosky's GPS location. (Doc. 53 at 4). As to Howard's argument that the GPS data effectively became Howard's data once law enforcement located Shalosky in Howard's vehicle, the Government asserts that law enforcement stopped using the GPS data and switched to physical observation once the vehicle was located. (*Id*. at 5). As such, the Government contends that the data was never used to track Howard. (*Id*.). Further, even if the officers had used the GPS data to track Howard, the Government argues that the co-conspirators and co-defendants are not afforded special standing by virtue of being "'aggrieved solely by the introduction of damaging evidence.'" (*Id*. at 6 (quoting *Alderman v. United States*, 394 U.S. 165, 171–72 (1969))).

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman*, 394 U.S. at 174. Thus, "to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society'" *Minnesota v.*

*Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143–44 (1978)).   In other words, the "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.'" *Rakas*, 439 U.S. at 143.

The monitoring of Shalosky with the GPS device and the use of the GPS data constitutes a search. *See Grady v. North Carolina*, 575 U.S. 306, 309 (2015).  The privacy interest invaded by such monitoring was Shalosky's physical movements, as captured by the GPS monitor. *See Carpenter v. United States*, 585 U.S. 296, 310 (2018) ("A majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements."). Howard has no privacy interest in Shalosky's physical movements—only his own— and therefore cannot lodge a Fourth Amendment challenge to law enforcement's invasion of Shalosky's privacy interest. *See United States v. Ellis*, 270 F. Supp. 3d 1134, 1140 (N.D. Cal. 2017) ("To the extent [the defendant] challenges the potential collection of signals from phones used by non-parties [to locate their phones], the government correctly points out that [the defendant] lacks standing to invoke the privacy rights of anyone else whose cell phone may have been located by [the cell site simulators].").

The Court also agrees with the Government that law enforcement's use of the

24

GPS tracking data ended once they located the vehicle. First of all, the target of the officers' initial investigation was Shalosky. Detective Hallam and Officer Hilde's reports both begin with them describing the officers as learning from a tip that Shalosky was selling drugs in Billings. (*See* Doc. 21 at 1, 5). At the hearing, Detective Hallam testified that the informant told him that Shalosky planned to sell someone drugs in the Cabela's parking lot in south Billings. Based on the information about Shalosky's potential drug deal at the Cabela's parking lot, law enforcement sought Shalosky's location through the GPS monitor, according to Detective Hallam. Thus, the officers' target in accessing the data on Shalosky's GPS monitor was Shalosky's location. At this point, Howard was not in the picture.

Once the officers accessed the data, they "were able to identify the vehicle [Shalosky] was in based on his GPS movements and the movements of the vehicle," a 2005 Jeep Liberty, according to Detective Hallam's report. (Doc. 21 at 1). Detective Hallam's report then states that law enforcement located the Liberty at the intersection of South 29th Street and 2nd Avenue South, then "began setting up in the area and conducting surveillance on the Liberty." (*Id.*). From there on, all the observations noted by the officers were physical observations, as demonstrated by the testimony of Officer Malcolm, whose role in the investigation was to surveil the Jeep and the apartment complex; the GPS data is never mentioned again. At no point until the vehicle was located and the officers transitioned to physical observation did

the officers seek to track Howard's physical location.

Accordingly, though a search of Shalosky occurred when the officers accessed his GPS monitoring data, Howard does not have standing to challenge that search.

>    2.    *Standing under Title III of the Omnibus Crime Control and Safe Streets Act*

On reply, Howard raises for the first time that Title III of the Omnibus Crime Control and Safe Streets Act of 1968 provides him standing to challenge law enforcement's use of Shalosky's GPS data. (Doc. 61 at 5–7). He argues Howard is an aggrieved party who can move to suppress the at-issue evidence under the statute because Shalosky's GPS data is an electronic communication under the act which was used to "directly" track Howard's location. (*Id.* at 7).

Title III of the Omnibus Crime Control and Safe Streets Act is a comprehensive statutory scheme governing the interception of wire, oral, and electronic communications. *United States v. Oliva*, 705 F.3d 390, 393 (9th Cir. 2012). It establishes "special safeguards against the unique problems posed by misuse of wiretapping and electronic surveillance" over and above Fourth Amendment protections. *United States v. Calandra*, 414 U.S. 338, 355 n.11 (1974). To comply with Title III, the government must not only satisfy the usual requirements of probable cause and particularity but also demonstrate a need for electronic surveillance, conduct it in a way that minimizes invasions of privacy, and comply with a complex web of authorization requirements. *See* 18 U.S.C. § 2518.

Title III's safeguards apply when the government "intentionally intercepts" or "endeavors to intercept ... any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). An electronic communication excludes "any communication from a tracking device," as defined in 18 U.S.C. § 3117. Under § 3117, a tracking device "means an electronic or mechanical device which permits the tracking of the movement of a person or object."

As an initial matter, the Court notes that it could decline to consider Howard's argument because it was raised for the first time on reply and the Government has not had an opportunity to respond to it. However, standing was not an issue until the Government raised it in its response, so the Court will consider the argument. *See United States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992) ("In his reply brief, Bohn argues for the first time that he was also denied assistance of counsel at the change of plea hearing. Although we ordinarily decline to consider arguments raised for the first time in a reply brief, we may consider them if, as here, the appellee raised the issue in its brief.").

The Court rejects Howard's motion on the grounds that Shalosky's GPS tracking device is not considered an electronic communication under the statute.

Accordingly, Title III does not confer Howard standing to suppress the at-issue evidence. The Court denies the motion.

## III.   Conclusion

IT IS SO ORDERED that Defendant Derry Jerel Howard's Motion to Suppress for Lack of Probable Cause in the Search Warrant Application (Doc. 50) and Motion to Suppress for the Illegal GPS Search (Doc. 51) are DENIED.

DATED this _7th_ day of June, 2024.

Susan P. Watters

SUSAN P. WATTERS
United States District Judge